UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIRSTEN KULIK,

    Plaintiff,

vs.

MEDICAL IMAGING
RESOURCES, INC., et al.,

    Defendants.
_____/

Civil Action No.
07-CV-11136

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is presently before the court on defendants' motion for summary judgment [docket entry 19]. Plaintiff has filed a response in opposition and defendants have filed a reply. Pursuant to E.D. Mich. LR 7.1(e)(2), the court shall decide this motion without oral argument.

This is an employment discrimination action. Plaintiff alleges that she was employed by defendants Medical Imaging Resources, Inc. ("MIR") and its principals, John Vartanian and Dean Tangalakis, from January through December 2005. Defendants allegedly discriminated against plaintiff by discharging her due, at least in part, to her gender and pregnancy. Plaintiff also alleges defendants paid her less than her male assistant. Plaintiff asserts a Title VII claim against MIR for gender, pregnancy and pay discrimination, a claim against all defendants under the Elliott-Larsen Civil Rights Act ("ELCRA") for gender, pregnancy and pay discrimination, and a claim against all defendants under the Equal Pay Act ("EPA"). For relief she seeks damages, costs, interest and attorney fees.

While the parties disagree over many factual details in this case, they agree on the

following basics. Defendant MRI, located in Ann Arbor, Michigan, leases and sells medical equipment. Defendants Vartanian and Tangalakis founded MRI and are its president and vice-president. They hired plaintiff in January 2005 for the position of administrative assistant and she began working in that capacity in February 2005 at an annual salary of $32,500. In September 2005 plaintiff informed defendants that she was pregnant. In October 2005 defendants hired Eric Gough to perform various administrative and computer-related tasks. He was paid wages at an hourly rate of $17.50. In mid-December 2005 defendants terminated plaintiff's employment.

Plaintiff's gender discrimination claim is based on her allegation that Gough, who she contends was hired as her assistant, replaced her when she was discharged. Plaintiff's pregnancy discrimination claim is based on her allegation that defendants discharged her, at least in part, because she was pregnant. And plaintiff's pay discrimination claims are based on her allegation that she was paid less than Gough although she supervised him and had greater responsibilities than he.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence "in the light most favorable to the opposing party," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970), summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See Anderson*, 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

The legal standards governing the burdens of proof and production in Title VII, ELCRA and EPA cases are well established. Under Title VII and ELCRA[1], plaintiff must first set forth a prima facie case of discrimination. If plaintiff states a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. If the employer does so, the burden shifts back to plaintiff to prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

In a gender discrimination case, plaintiff states a prima facie case by showing that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). "Similarly situated" means that plaintiff and the non-protected employee "must be similar in 'all of the relevant aspects.'" *Barnes v. City of Cincinnati*,

---

[1] Michigan courts follow Title VII precedents when analyzing claims brought under ELCRA. *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Hall v. State Farm Ins. Co.*, 18 F. Supp.2d 751, 766 (E.D. Mich. 1998).

401 F.3d 729, 737 (6th Cir. 2005), *quoting Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir.1998). In a pregnancy discrimination case, plaintiff states a prima facie case by showing that "1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). In both types of cases, an employee is qualified if she "was performing "at a level which met [her] employer's legitimate expectations." *Id.*

To show that her employer's proffered reason for the adverse employment action in question is pretextual, plaintiff

> must show one of the following: "(1) that the proffered reason[ ] had no basis in fact, (2) that the proffered reason[ ] did not actually motivate the action, or (3) that the proffered reason[ was] insufficient to motivate the action."
>
> Under the first and third methods of showing pretext, the fact finder may infer discrimination from the circumstances. Under the second method, [plaintiff] may not rely exclusively on his prima facie evidence, but instead must introduce some further evidence of discrimination.

*Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 589 (6th Cir. 2002) (citations and footnote omitted).

The legal standards governing an EPA claim have been summarized by the Sixth Circuit as follows:

> The EPA prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work. *See* 29 U.S.C. § 206(d)(1). In order to establish a prima facie case of wage discrimination under the EPA, plaintiffs must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires

4

> equal skill, effort, and responsibility, and which are performed under similar working conditions." Jobs need not be identical in order to be considered "equal work" under the EPA. Whether a job is substantially equal for purposes of the EPA is determined on a case-by-case basis and "resolved by an overall comparison of the work, not its individual segments."
>
> "Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." "Once the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." Because these are affirmative defenses, the defendant bears the burden of proof. The burden shifting under the EPA differs from the Title VII framework, in which a "defendant need only assert a legitimate, non-discriminatory reason for the different treatment afforded the plaintiff as compared to her similarly situated male co-workers," at which point the burden shifts back to the plaintiff to show pretext. Under the EPA, however, the plaintiff "never bears the burden of persuasion regarding the affirmative defenses."

*Beck-Wilson v. Principi*, 441 F.3d 353, 359-60 (6th Cir. 2006) (citations omitted).

Having reviewed the parties' briefs and exhibits, the court concludes that plaintiff has failed to make out a prima facie case of gender, pregnancy or pay discrimination. No gender discrimination claim has been stated because plaintiff has not shown she was qualified (i.e., meeting her employer's expectations) or that she was similarly situated to the male employee, Eric Gough, with whom she compares herself. No pregnancy discrimination claim has been stated because, again, plaintiff has not shown she was qualified or that a nexus exists between her pregnancy and her termination. Even if plaintiff had stated a prima facie gender or pregnancy discrimination claim, she has not shown that defendants' explanations for paying Gough more and for discharging plaintiff are pretexts for discrimination. The EPA claim fails for similar reasons. Plaintiff has not stated a

5

prima facie case because she has not shown that Gough was actually paid more than she or that she and Gough were performing equal work. Nor has she shown the existence of a triable factual dispute as to defendants' explanation for the pay differential, namely, Gough's superior educational qualifications and work experience.

The first difficulty with plaintiff's gender and pregnancy discrimination claims is that she has not stated a prima facie case because she has not shown she was meeting her employer's legitimate expectations. Defendant Vartanian testified that plaintiff "was falling behind on being able to get tasks done"; that "her work wasn't getting done on time" but she still spent company time using the internet for personal purposes (shopping); that "other employees complained about her"; that he "couldn't get her to perform her job duties, yet she was on the phone quite a bit"; that she did not have the competence in internet marketing or web design the company needed; that she was "hard to get along with" and "snippy"; that she was "a sub par employee" and not dependable; that she "was not getting her work done in a timely manner, not doing her work correctly in certain endeavors, . . . certainly not getting along with others very well, and creating an overall very bad atmosphere in the office"; and that other employees complained about plaintiff not supporting them and interns complained that plaintiff "verbally abused" them. Vartanian dep., pp. 20, 35-37, 88, 96-98. Defendant Tangalakis testified that after plaintiff was discharged he "took over a lot of [her] duties myself because they simply weren't getting done effectively by Miss Kulik"; that she was discharged because of "[p]oor performance, inability to work with other employees, poor attitude, issues with her dependability in showing up to work. Not being a team player. Having to constantly correct her work, it was substandard"; and that "anytime that I gave her something to do from a clerical standpoint always had to be reviewed and corrected by myself, and I insisted on that,

6

because of her poor quality of work in those areas." Tangalakis dep., pp. 25, 45, 52. One of defendants' sales employees, Karen Dixon, testified that she complained to Vartanian about plaintiff "quite often" because "[i]t was tough to get her to do the things that we needed," including issuing the company's monthly newsletter; that plaintiff was "snippy"; that "[i]f I needed her to do something . . . I would get attitude, I would get, I don't understand, . . . if you were able [to] get her to do something, it was half-hearted, it wasn't – you couldn't get what you were looking for. It took you ten or twelve tries to get something"; and that within the company "everybody was happy" when plaintiff left because "there was a lot less tension." Dixon dep., pp. 11, 23, 25, 34, 36. The office manager, Laura Gough, testified that she, too, complained to Vartanian about plaintiff "about her lack of professionalism with the customers when they called in or stopped by the office I complained about her unprofessional way she carried herself and the way she dressed. I complained about her being rude and uncooperative and very snotty. And I complained about her not completing her jobs in a timely planner [sic], which in turn held up other people that were trying to do their jobs"; and that plaintiff was not getting the monthly newsletter out on time. Laura Gough dep., pp. 27-29.

Clearly, plaintiff was not performing as an administrative assistant "at a level which met [her] employer's legitimate expectations." *Cline, supra.* Nor can plaintiff turn this into a triable issue of fact by pointing to her own testimony that she believed she was doing her job well and was never criticized.[2] Kulik dep., pp. 26-27, 55-56, 59. The issue is whether the employer's legitimate

---

[2] Plaintiff even testified that Vartanian and Tangalakis "never" spoke to her about her absenteeism or her personal use of the internet or telephone during work hours, Kulik dep., pp. 113-115, although Employee Performance Worksheets show that plaintiff was admonished repeatedly concerning these issues. *See* pltf's Ex. F, R; dfts' Ex. F, H, J, N.

7

expectations were being met, and defendants have testified in detail as to the reasons why they were not.

To the extent plaintiff bases her gender discrimination claim on the allegation that defendants paid her less than they paid Gough, she has failed to state a prima facie case because she has not demonstrated that she and Gough were similarly situated in all relevant respects. During the time frame in question (October - December 2005), plaintiff was a salaried employee being paid $32,500 per year. She also received ten paid vacation days and could participate in the company's 401(k) retirement program. *See* dfts' Ex. B. By contrast, Gough was a "full-time temporary" hourly employee being paid $17.50 per hour with no benefits. Gough dep., pp. 25-26, 39; Vartanian dep., p. 21. The two cannot be compared.[3]

Moreover, plaintiff and Gough plainly were not similarly situated because Gough had more education and greater work experience than she. Plaintiff testified that although she has been taking community college classes since 1992, she has not yet earned an associate's degree. Pltf's dep., p. 10. Gough earned a bachelor's degree in aviation management (which included course work in human resources, business management and organizational development) from Eastern Michigan University in 2000, and he is currently working on a master's degree in human resources management. Gough dep., pp.7-8; dfts' Ex. O. Plaintiff testified that from 1992 until February

---

[3]Plaintiff impermissibly focuses solely on her and Gough's hourly pay rates, thereby disregarding the value of her status as a "permanent employee" with benefits. *See* dfts' Ex. B (offer letter). Assuming that plaintiff was not required to work on holidays, that she worked 40 hours per week on average, and that she used all of her vacation days, she would have worked approximately 1,920 hours over the course of a year (48 weeks x 40 hours/week). This would translate to an hourly rate of pay of $16.93, slightly less than Gough's hourly rate of $17.50. But if one adds to plaintiff's rate of pay the value of her benefits, both tangible and intangible, it would appear that plaintiff was actually being compensated at a rate higher than Gough.

2005, she worked at a series of jobs lasting from six months to three years as a receptionist or office assistant/manager, mainly in very small offices. Pltf's dep., pp. 10-37. By contrast, Gough worked from 1994 to 2002 for two airlines, first as a customer service agent and then as an administrative supervisor, with significant supervisory responsibilities. Gough dep., pp. 11-13; dfts' Ex. O.

Gough and plaintiff were not similarly situated, and he is therefore not a fair "comparable" another reason: Gough's computer skills were superior to plaintiff's. At the time Gough was hired, he was already proficient in HTML, while plaintiff was not. Gough dep., at 161; dfts' Ex. O; pltf's dep., p. 41. This skill was important to defendants because it is used in designing web pages. Vartanian dep., p. 95. Defendant Vartanian testified that plaintiff "indicated to me that she was very competent in that, and as it turned out from my evaluation I didn't think that was true. Basically she had a book open and was teaching herself on our time." *Id.*

To the extent plaintiff bases her gender discrimination claim on the allegation that defendants replaced her with male, she has failed to state a prima facie case for the same reasons just indicated. In addition, plaintiff has not demonstrated that she was in fact "replaced by a person outside the protected class." *Peltier, supra.* While plaintiff alleges that Gough was her "assistant" and that he "replaced her when she was terminated," Complaint ¶¶ 15, 17, the deposition testimony clearly shows that Gough and plaintiff had overlapping but different responsibilities and that after plaintiff was discharged the tasks she performed were either outsourced or divided among the remaining employees. Vartanian testified that plaintiff's internet marketing responsibilities were outsourced and that her other tasks (e.g., making travel arrangements, answering telephones, shipping and receiving duties) were handled by Vartanian, Tangalakis, Gough and Laura. Vartanian dep., pp. 88-90. When asked what became of plaintiff's responsibilities, Karen Dixon testified that

9

"Eric took some over, Laura took some over, the mobile group took some . . . . John and Dean ended up having to take some of the things from us. . . . We all kind of chipped in." Dixon dep., p. 35. Tangalakis testified that he "took over a lot of those duties myself because they simply weren't getting done effectively by Miss Kulik." Tangalakis dep., p. 45. Gough testified that "we all took parts" of plaintiff's responsibilities, and that "maybe I would be the one that has the most of them, but I oversee them now that they're done now." Gough dep., pp. 130-31. Gough took over some of plaintiff's duties directly, *id.* at 24-25 (running reports, creating the newsletter), but he also testified about several differences between his job as compared to plaintiff's. *Id.* at 163-70 (budgeting, CRM database, inventory control, OSHA, human resources). On this record, it simply cannot be said that plaintiff was replaced by Gough. Her responsibilities were taken over by several employees, not just Gough, and Gough had many areas of responsibility in which plaintiff was not involved.

Plaintiff has also failed to state a prima facie case of pregnancy discrimination. One element of a prima facie pregnancy discrimination claim is that plaintiff was qualified for her job. For the reasons indicated above, the court concludes plaintiff has failed to make this showing. Another element is that there be "a nexus between her pregnancy and the adverse employment decision." *Cline, supra.* In this case, evidence of such a nexus is completely lacking. Plaintiff has no evidence that defendants made any negative comments about her pregnancy. To the contrary, plaintiff testified that when she told Vartanian she would like to take maternity leave for six weeks to three months, "[h]e said we will see what we can do and that was the end of it." Pltf's dep., p. 57. Nor is this a case where an inference of discrimination arises from the temporal proximity between plaintiff's informing her employer of her pregnancy and her discharge. In this case three

months elapsed between the two events, and in the interim defendants even paid for plaintiff to attend a four-day "search engine marketing conference" in Las Vegas. Pltf's dep., pp. 106-107. These are not circumstances suggestive of a nexus between plaintiff's pregnancy and defendants' decision to discharge her.

Even assuming that plaintiff had stated a prima facie case of gender or pregnancy discrimination, she has failed to produce evidence from which a jury could find that defendants' reasons for discharging her were pretexts. Vartanian testified "there are many reasons.[4] Mostly we wanted to out source the position, and coupled with the lack of performance and attendance, and her inability to get along with others, or support others, as her job required, made it very difficult to have Kirsten as an employee. . . . [W]e needed to out source the [internet marketing] job . . . to somebody – or some entity that is more capable at a higher level of doing this kind of work." Vartanian dep., pp. 87-88. Plaintiff likewise testified that when Vartanian discharged her "[h]e informed me that they are outsourcing my position, that I was no longer needed. . . . John . . . stated they were outsourcing the marketing end of my position." Pltf's dep., pp. 69, 73. After plaintiff was discharged, her internet marketing duties were in fact outsourced, Vartanian dep., p. 88, Gough dep., p. 137, and plaintiff has no evidence to the contrary.

Plaintiff's EPA claim fails for the same reasons. As noted above, to state a prima facie case of pay discrimination plaintiff must show she and Gough performed "equal work on jobs

---

[4]The "many other reasons" include those discussed above. In addition, defendants testified that the "final straw" was an incident in mid-December when plaintiff took several days off for medical reasons but failed to produce a doctor's note. Plaintiff testified that she had such a note faxed, and she has produced a fax cover sheet purporting to show that the note was faxed to defendants three days before they discharged her. Pltf's Ex. C. Defendants testified they did not see the note. Vartanian dep., p. 86; Tangalakis dep., pp. 96-97.

the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Beck-Wilson, supra.* Plaintiff has failed to meet this burden. For the reasons explained above, plaintiff has not shown that Gough was paid more (*see* n.3, *supra*), or that she and Gough performed the same work, or that she and Gough had equal skills. Even if plaintiff had succeeded in stating a prima facie case, and assuming a pay differential actually existed, there is no genuine issue of fact regarding defendants' explanation of the difference, namely, that Gough had more education, more skills, and more desirable work experience, all of which are clearly legitimate factors "other than sex." 29 U.S.C. § 206(d)(1)(iv).

For these reasons, the court concludes that plaintiff has failed to state a prima facie case of gender or pay discrimination under Title VII, ELCRA or the EPA. Nor is there a genuine issue of fact as to defendants' explanation for discharging plaintiff, "replacing" her with Gough, or for paying Gough what plaintiff alleges to be a higher wage. Accordingly,

IT IS ORDERED that defendants' motion for summary judgment is granted.


s/Bernard A. Friedman_____
Dated: June 12, 2008　　　　　　　　BERNARD A. FRIEDMAN
　　Detroit, Michigan　　　　　　　CHIEF UNITED STATES DISTRICT JUDGE